THE BROADCAST TEAM,
INC., Plaintiff,

v.

FEDERAL TRADE COMMISSION,
Defendant.

No. 6:05CV1342 ORL 22JGG.

United States District Court,
M.D. Florida,
Orlando Division.

April 14, 2006.

---

Gregory Dean Snell, Snell Legal, Ormond Beach, FL, William E. Raney, Copilevitz & Canter, Kansas City, MO, for Plaintiff.

Warren A. Zimmerman, U.S. Attorney's Office, Tampa, FL, John F. Daly, Michael D. Bergman, Federal Trade Commission Office of the General Counsel, Washington, DC, for Defendant.

## ORDER

CONWAY, District Judge.

### I.  INTRODUCTION

The Broadcast Team, Inc. ("TBT") seeks judicial review of the "abandoned calls" component of the Federal Trade Commission's Telemarketing Sales Rule ("TSR").[1] The FTC interprets the abandoned calls provision as preventing for-profit "telefunders," such as TBT, from utilizing prere-corded calls to solicit funds on behalf of non-profit charities. Previously, the Court denied TBT's motion for a preliminary injunction. Now, the FTC seeks dismissal of TBT's Complaint, on the ground that it fails to state a claim upon which relief may be granted. After carefully considering the parties' arguments, the Court determines that the FTC's motion is due to be granted.

### II.  BACKGROUND

TBT is a for-profit company which has the technological capability to generate high volumes of automated telephone calls. TBT maintains that it does not perform live telemarketing for any of its clients. Rather, the company says it merely allows its customers to "access" or "use" its computerized systems to send prerecorded messages to telephone numbers chosen by the client. TBT alleges that it and the Salvation Army entered into an arrangement under which the charity would "use" TBT's equipment to send prerecorded messages to solicit funds for Hurricane Katrina relief efforts. The solicitation campaign was scheduled for the week of September 6, 2005. The planned "pitch" consisted of two prerecorded scripts, one for live recipients and one for answering machines.

TBT contends a staff attorney for the FTC informed TBT that the calls which were to be made under this arrangement violate the TSR because they constitute "abandoned" calls. Additionally, the FTC threatened TBT with legal action concerning the planned campaign.[2] TBT seeks declaratory and injunctive relief concerning the FTC's interpretation of the TSR.

---

**1.** 16 C.F.R. Part 310.

**2.** At the time TBT initiated this suit and moved for a preliminary injunction, the FTC had merely threatened enforcement action. That threat later materialized. *See United States v. The Broadcast Team, Inc., et al.,* No. 6:05–cv–1920–Orl–22JGG.

On January 6, 2006, following a hearing, the Court entered an Order denying TBT's motion for a preliminary injunction, principally because TBT failed to establish a substantial likelihood of success on the merits of its claims. *See* Doc. 29.

## III. THE ABANDONED CALLS PROVISION

Under 16 C.F.R. § 310.4(b)(1)(iv), it is an "abusive telemarketing act or practice" for a telemarketer to "[a]bandon[ ] any outbound telephone call." The regulation further states: "An outbound telephone call is 'abandoned' under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting." *Id.*

The dispute in this case arises from the FTC's interpretation of this provision. In the FTC's view, calls made by telefunder which are actually received by a person (as distinguished from those connected to an answering machine) are abandoned if they are not connected to a live sales representative within two seconds of the completed greeting. In other words, the FTC's interpretation of § 310.4(b)(1)(iv) is that "sales representative" means a "live" sales representative, i.e., an actual person, and not a recording.

## IV. ANALYSIS

### A. Count I

■ In Count I of the Complaint, TBT challenges the FTC's position that TBT is a "telemarketer" as that term is defined in the TSR. In that regard, TBT states:

The Contract between TBT and the Salvation Army calls for a message determined by the Salvation Army to be sent to persons designated by the Salvation Army at times and dates specified by the Salvation Army. These messages are

therefore placed "by" the Salvation Army and are not within the jurisdiction of the FTC. The use of TBT's equipment to send these messages does not change the fact that the Salvation Army is the speaker for statutory and constitutional purposes. TBT is not a "telemarketer" as that term is defined in the TSR as this call is conceived, initiated, executed and staffed by the Salvation Army and .its staff and volunteers. No TBT employee ever directly speaks to a consumer on the telephone.

Doc. 1, ¶ 65, at 19. Consequently, says TBT, the FTC's interpretation of the TSR is arbitrary, capricious, an abuse of discretion, and exceeds the FTC's statutory authority. *Id.,* ¶ 66, at 19.

Under the TSR, "Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(bb). "Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services *or a charitable contribution,* by use of one or more telephones and which involves more than one interstate telephone call." § 310.2(cc) (emphasis added). Moreover, "[a] telemarketer initiates a telephone call by causing the called consumer's telephone to ring." 68 Fed.Reg. at 4643. Even though TBT may be "providing" its equipment to its customers in the very broad sense of the word, the equipment is physically located at TBT's place of business, the equipment is operated by TBT's personnel, and TBT is the entity which causes the consumer's telephone to ring.[3]

In its response to the motion to dismiss, TBT asserts that TBT and the Salvation Army considered their contract "to be a lease of TBT's equipment for use by Salvation Army to place these calls." Doc. 41-1

---

3. TBT's counsel conceded these facts at the     preliminary injunction hearing.

at 8. To support this position, TBT has attached to its response an addendum to the original agreement between TBT and the Salvation Army. Doc. 41–2.[4] That document adds the following language to the original agreement:

> 15. LEASE CREATED: The parties agree that this agreement shall be a lease of TBT's equipment and the term of the lease created shall be until such time that USER's calling requirements are completed. The Equipment is, and shall at all times be and remain, the sole and exclusive property of TBT; and the USER shall have no right, title or interest therein or thereto except as expressly set forth in this Lease. USER shall not assign this Lease or its interest in the Equipment without the prior written consent of TBT.

*Id.*

In the first place, it is questionable whether this Court may properly consider this document in connection with a motion to dismiss, inasmuch as it was not attached to TBT's Complaint. In any event, regardless of how the parties to the agreement decided to characterize the use of TBT's equipment as between themselves, the undisputed fact remains that it is TBT which causes the consumer's telephone to ring.

Based on the foregoing, TBT is a "telemarketer" within the meaning of the TSR. To conclude otherwise under these circumstances would be to elevate form over substance.

## B. Count II

█ In Count II of the Complaint, TBT alleges that the TSR (as interpreted by the FTC) is a content-based restriction on protected speech which violates the First Amendment. More specifically, TBT states:

> The fully protected, noncommercial speech of the Salvation Army through TBT is restricted by the TSR, whereas no restrictions are placed on (a) purely commercial speech of banks, savings associations, credit unions, telephone companies, air carriers, common carriers, and insurance companies outside the scope of the FTC's jurisdiction; (b) non-profit organizations that communicate directly with donors; and (c) certain types of speech based on the content and the speaker, for example, political speech by candidates and political parties. By favoring commercial speech over the noncommercial speech of TBT, the TSR violates the constitutional rights of these nonprofit organizations.

Doc. 1, ¶ 69, at 20.

The FTC counters that the TSR is not actually a content-based. Among other things, the agency argues that it "regulates telefunders, but not charities directly, under the TSR because the USA PATRIOT Act extended the Telemarketing Act's proscriptions to charitable solicitations, but did not extend the [FTC's] jurisdiction over nonprofits." Doc. 39 at 11. Thus, maintains the FTC, the distinction between in-house charitable solicitors and telefunders is based on "the 'neutral justification' of the [FTC's] jurisdictional boundaries," rather than any unconstitutional reason. *Id.* The agency also contends "the distinction between the for-profit telefunder and non-profit charity is not based on the content of the message, because they presumably give the same message for the same cause." *Id.* Further, the FTC asserts that "[i]t was also rational for Congress to subject for-profit

---

**4.** The original contract and the addendum were actually signed by New River Communications, Inc., the Salvation Army's agent.

telefunders to the Telemarketing Act and the TSR, even if not-for-profit charities are not covered, because telefunders are more likely to engage in abusive behavior than volunteers or employees of the charities." *Id.* at 12.

The FTC also argues that the TSR is not rendered unconstitutional merely "because it does not cover certain commercial telemarketers, such as banks or common carriers." *Id.* at 13. "As with charities," says the agency, "this distinction is based on the neutral justification of the Commission's jurisdiction[.]" *Id.* The FTC points out that "commercial telemarketers not subject to the TSR are fully covered by the FCC's [Telephone Consumer Protection Act] rules which are virtually identical in all relevant respects to the TSR." *Id.* (footnote added).

The FTC also asserts that "political fundraising calls are not subject to the TSR ... because political contributions are not considered either charitable or commercial." *Id.* The agency notes that "political fundraising is subject to a separate comprehensive statutory regime (the Federal Election Campaign Act of 1971 ('FECA'), 2 U.S.C. §§ 431–455 (2004)) and agency (the Federal Election Commission) to regulate such fundraising." *Id.*

In response, TBT argues that the following circumstances demonstrate that the abandonment provision is content-based: (1) the FTC has informally decided not to enforce the ban on pre-recorded calls in situations where the consumer has given prior consent for such calls, Doc. 41–1 at 9–10; (2) "the FTC has promulgated a proposed amendment to the TSR which would expressly allow prerecorded calls to persons with whom the caller has an established business relationship," and the agency has stated that it "will not enforce its abandonment provision against prerecorded calls to established customers pending the finality of this proposed change if the calls comply with the proposed amendment," *id.* at 12; and (3) "the TSR restriction is underinclusive and content-based because it does not apply to charities which conduct their solicitations in house or through volunteers," *id.* at 13.

Contrary to TBT's assertions, the TSR is not a content-based restriction on speech. "Like time, place, and manner restrictions, the TSR provisions do not exhibit any disapproval of the content of the calls placed by telefunders." *National Federation of the Blind v. F.T.C.*, 420 F.3d 331, 350 (4th Cir.2005) ("*NFB II*"), *cert. denied*, —— U.S. ——, 126 S.Ct. 2058, 164 L.Ed.2d 779, 74 U.S.L.W. 3438 (2006); *see also Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591, 596 (8th Cir.2005) (determining that state's do-not-call statute was content-neutral, in part because "North Dakota has not distinguished between professional and in-house charitable solicitors because of any disagreement with the message that would be conveyed"), *cert. denied*, —— U.S. ——, 126 S.Ct. 2058, 164 L.Ed.2d 781, 74 U.S.L.W. 3532 (2006).[5] This is because in-house solicitors and telefunders convey the same substantive message.[6] *Stenehjem*, 431 F.3d at 596 ("the message [conveyed by telefunders and in-house charitable solicitors] would be identical regardless of who conveyed it"). Likewise, the FTC's more specific position, that telefunders using entirely prerecorded messages violate the abandonment provision of the TSR, is content-neutral. Again, that interpreta-

---

5. Although *Stenehjem* addressed North Dakota's do-not-call statute, rather than the TSR, this Court finds much of the Eighth Circuit's reasoning equally applicable in the TSR context.

6. Whether they convey that message in the same style is another matter.

tion does not "exhibit any disapproval of the content of the calls placed by telefunders[;]" it "applies evenhandedly to solicitations for charities of all persuasions and beliefs." *NFB II*, 420 F.3d at 350.[7]

Moreover, the distinction the TSR draws between telefunders and in-house charitable solicitors is a product of the FTC's jurisdiction, and nothing more. The Telemarketing Act initially directed the FTC to create rules prohibiting telemarketers from undertaking "a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." 15 U.S.C. § 6102(a)(3)(A). The Act "instructed the FTC to regulate telemarketers *both* to prevent fraud *and* to protect the privacy of the home." *NFB II*, 420 F.3d at 337 (emphasis in original). However, under the original Telemarketing Act, non-profit entities were outside the FTC's jurisdiction. *Id.* at 334 (stating that the Telemarketing Act did nothing to change the fact that non-profit organizations fell outside the FTC's jurisdiction). In 2001, Congress amended the Telemarketing Act by, *inter alia*, including charitable solicitations within the definition of telemarketing. 15 U.S.C. § 6106(4); *see also, NFB II*, 420 F.3d at 335. However, Congress did not expand the FTC's jurisdiction to encompass non-profit organizations; as before, the FTC's jurisdiction covers only for-profit telemarketers. *NFB II*, 420 F.3d at 335–36. The charitable solicitation amendments constituted "new congressional instructions" to the FTC. *Id.* at 335. Accordingly, the FTC promulgated a new TSR which required for-profit entities soliciting on behalf of charities to comply with the TSR. *Id.* at 335–36.

In *NFB II*, the Fourth Circuit observed that "the FTC faced a quandary" in "[a]ttempting to formulate [the new TSR] in accordance with Congress' directions[.]" *Id.* at 335. "Congress had not altered the jurisdictional provisions in the Telemarketing Act, thus leaving the FTC without jurisdiction over non-profit organizations[;]" however, "at the same time, Congress did amend the definition of 'telemarketing' to cover charitable solicitations." *Id.* "To reconcile those two congressional mandates," the FTC concluded that " 'for-profit entities that solicit charitable donations now must comply with the TSR, although the Rule's applicability to charitable organizations themselves is unaffected.' " *Id.* at 335–36 (quoting 68 Fed.Reg. 4580, 4585). The Fourth Circuit stated that the FTC's reconciliation constituted "the only logical conclusion." *NFB II*, 420 F.3d at 347. Accordingly, "the distinction about which [TBT] complain[s] was something the agency was bound to make by simple application of its jurisdictional limitations." *Id.*

Telemarketing by banks, savings associations, credit unions, common carriers and insurance companies is outside the reach of the TSR for the same reason: the FTC simply does not have jurisdiction over these entities. *See National Federation of the Blind v. F.T.C.*, 303 F.Supp.2d 707, 717 & 718 n. 6 (D.Md.2004) ("*NFB I*"), *aff'd* 420 F.3d 331 (4th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 2058, 164 L.Ed.2d 779, 74 U.S.L.W. 3438 (2006); 15 U.S.C. §§ 6105(a), 45(a)(2) & 1012(b). Moreover, "the gap created by the FTC's limited jurisdiction is filled by the FCC;" "[t]he TCPA and the rules implementing it are applicable to all telemarketing, including those entities over which the FTC lacks jurisdiction." *NFB I*, 303 F.Supp.2d

---

**7.** For the same reasons, exempting calls made to consenting consumers and those with whom the telefunder's charity has a prior business relationship does not reflect any content-based determination.

at 718. "Thus, the commercial entities outside of the FTC's jurisdiction are within the jurisdiction of the FCC." *Id.* "Because the FCC regulates these commercial entities to the same extent that the FTC regulates entities within its jurisdiction, this 'exemption' from the TSR does not demonstrate any intent by the government to favor one group's speech over another because of the content of the message." *Id.*

Similarly, "political fundraising is exempt from regulation by the TSR not because it deals with politics as opposed to other subjects, but because gifts to political organizations are simply not considered 'charitable,' and accordingly, are not within the scope of the TSR." *NFB I*, 303 F.Supp.2d at 719; *see also id.* at 719 n. 8 (interpreting the definition of "telemarketing" contained in 15 U.S.C. § 6106(4) to mean that "even if a political contribution is a thing of value, because it is not charitable, it is not regulated by the TSR"). Once again, the distinctions about which TSR complains are based are the "neutral justification" of the FTC's jurisdictional limitations.

■ Based on the foregoing, the Court rejects TBT's position that the TSR in general, and the FTC's interpretation that pre-recorded calls by telefunders are "abandoned," are content-based restrictions on speech. Because the TSR is content-neutral, the Court must consider the following test to determine whether it passes constitutional muster: (1) whether the government has a "sufficient or legitimate interest;" (2) "whether the interest identified [is] significantly furthered by a narrowly tailored regulation;" and (3) "whether the regulation substantially limit[s] charitable solicitations." *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591, 597 (8th Cir.2005) (internal quotation marks omitted); *see also NFB II*, 420 F.3d at 338 ("A regulation will be sustained if (1) it serves a

sufficiently strong, subordinating interest that the government is entitled to protect and (2) it is narrowly drawn to serve the interest without unnecessarily interfering with First Amendment freedoms" (internal quotation marks, brackets and ellipses omitted)).

The Court determines that the TSR passes this test. The FTC's legitimate interests in safeguarding fraud and residential privacy are unquestionably strong. See; *NFB II*, 420 F.3d at 339–40; *NFB I*, 303 F.Supp.2d at 720; *see also Stenehjem*, 431 F.3d at 597.

The TSR is also narrowly tailored. *See NFB II*, 420 F.3d at 341–51; *NFB I*, 303 F.Supp.2d at 720–22; *see also Stenehjem*, 431 F.3d at 597–99 (construing North Dakota's do-not-call statute). Exempting telefunders from the TSR would weaken the FTC's efforts to safeguard residential privacy. *See Stenehjem*, 431 F.3d at 598 ("North Dakota's goal of ensuring residential privacy would be achieved less effectively if the legislature exempted professional charitable solicitors from the [state's do-not-call] Act"). Moreover, this Court hesitates to substitute its judgment for the FTC's regarding whether telefunders' solicitation calls are more annoying, abusive and intrusive than those made by charities, and whether the TSR is necessary to curb these ills. *See id.* ("we are reluctant to second-guess the North Dakota legislature's judgment that professional charitable solicitors intrude more regularly on residents' privacy than volunteers or employees and that [the state's do-not-call] Act is a necessary means of enabling its citizens to halt these intrusions"). The same rationale applies to the FTC's interpretation of the TSR as prohibiting prerecorded "cold" calls by telefunders. It cannot seriously be questioned that subjecting a non-consenting consumer who has no prior relationship to a charity to a prere-

corded message from a telefunder soliciting on behalf of that charity is both intrusive and annoying. Invalidating the FTC's interpretation of the abandoned calls provision would frustrate the agency in achieving its goal of protecting the residential privacy of consumers. For the same reasons that the TSR is not content-based, it is not underinclusive. *See NFB I,* 303 F.Supp.2d at 721; *NFB II,* 420 F.3d at 345–49; *see also Stenehjem,* 431 F.3d at 598. Most significantly, charitable organizations are entirely free to communicate their messages and solicit donations, directly and through telefunders; all that is restricted is the manner in which telefunders may do so. Further, telefunders are subject to an entity-specific do-not-call list, rather than the national list. *NFB II,* 420 F.3d at 342; *NFB I,* 303 F.Supp.2d at 721. "Under this procedure, a consumer cannot report to a central authority that he wishes not to be called by any telemarketers generally; he must instead repeat his request as to each caller individually." *NFB II,* 420 F.3d at 342. "[C]ompany-specific do-not-call lists are much less invasive of speech than the national do-not-call registry, for telefunders working for non-profits are permitted to call anyone once in an effort to convey their message and solicit donations." *NFB I,* 303 F.Supp.2d at 721. Finally, the call abandonment provision of the TSR includes "a safe harbor that is not unduly burdensome." *NFB I,* 303 F.Supp.2d at 721. Considered collectively, these circumstances convince this Court that the TSR is a narrowly drawn regulation.

Finally, this Court concludes that the TSR does not substantially limit charitable solicitations. The regulation does not foreclose all avenues of charitable solicitation. *See Stenehjem,* 431 F.3d at 599. Employees and volunteers of charities may solicit funds from residential consumers, and telefunders may do so subject only to the reasonable restrictions contained in the TSR, including the ban on prerecorded messages. Charities may also solicit funds personally or via the mail. *Id.* Consequently, while the TSR does restrict charitable solicitation, a number of alternative avenues of communication remain intact. *Id.*

Based on the foregoing, the Court concludes that TBT's First Amendment challenge to the TSR is legally baseless.

### III. Count III

Count III of the Complaint alleges that the TSR constitutes a prior restraint. This claim, too, is without merit. As the Fourth Circuit stated in *NFB II,* prior restraints are traditionally found in the context of injunctions or licensing schemes which confer unbridled discretion upon government officials. 420 F.3d at 350 n. 8. Here, as in *NFB II,* "it is only after the speech is uttered that a violation of the TSR can occur and sanctions can be imposed." *Id.; see also NFB I,* 303 F.Supp.2d at 723.

### IV. Count IV

Count IV of the Complaint alleges claims of vagueness and overbreadth. In its response to the FTC's motion, TBT does not squarely address the FTC's dismissal arguments regarding these claims. *See* Doc. 41–1 at 15 & 16.

■ The TSR's abandonment provision is not vague. As previously noted, the FTC's position is that calls made by a telefunder which are actually received by a person (as distinguished from those connected to an answering machine) are abandoned if they are not connected to a live sales representative within two seconds of the completed greeting. In other words, the FTC's interpretation of 16 C.F.R. § 310.4(b)(1)(iv) is that "sales representative" means a "live" sales representative, i.e., an actual person, and not a recording. This construction is neither incorrect nor

unreasonable. To the contrary, as the Court ruled in its Order denying TBT's motion for a preliminary injunction, "the FTC's construction of the phrase seems to comport with common sense and ordinary usage." Doc. 29 at 3. Accordingly, the abandonment provision, as interpreted by the FTC, is sufficiently definite to satisfy constitutional standards.

The Court rejects TBT's overbreadth challenge, as well. TBT has not alleged "that there are third parties whose speech rights will be affected in a manner different from [TBT's] own rights," nor has it alleged that "these third parties' rights will be significantly compromised by the TSR." *NFB I,* 303 F.Supp.2d at 722. Additionally, to the extent TBT views the TSR as overbroad because "it is not narrowly tailored to restrict only as much speech as will serve the government's substantial interests," *id.* at 723, this Court has already rejected that argument in connection with its First Amendment analysis of the regulation, *see id.* Finally, with regard to TBT's argument that the FTC's interpretation of the TSR is unrelated to the twin evils that prompted the abandoned calls rule ("hang-ups" and "dead air"), the fact remains that the FTC has broad statutory authority to prevent abusive telemarketing practices. *See* 15 U.S.C. § 6102(a)(3)(A) (requiring the FTC to enact rules prohibiting telemarketers from "undertak[ing] a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy"). The FTC's interpretation is entirely consistent with this broad statutory charge.

## V. Count V

TBT advances an equal protection claim in Count V of the Complaint. However, "there is no Equal Protection violation for the same reasons there is no First Amendment violation." *NFB II,* 420 F.3d at 350 n. 8; *see also NFB I,* 303 F.Supp.2d at

724. This is true even under strict scrutiny review. *See NFB I,* 303 F.Supp.2d at 724.

## VI. Count VI

■ In Count VI, TBT alleges that the call abandonment provision, as interpreted by the FTC, exceeds the agency's statutory authority and conflicts with the FCC's abandonment rules. In that regard, the Complaint alleges, in pertinent part:

> By interpreting the TSR to ban prerecorded calls placed by the Salvation Army using TBT's equipment, the FTC has usurped authority granted by Congress exclusively to the FCC, and exceeded its authority under the Telemarketing Act. This interpretation also conflicts with the FCC's rules which expressly allow these calls. Congress has directed the FTC and FCC to promulgate consistent rules. Consistency is not aspirational. It is required by Congress pursuant to section 3 of the [Do Not Call Implementation] Act.

Doc. 1, ¶ 94, at 26 (footnote added; citation to DNC Act and quoted language omitted).

In *NFB II,* the Fourth Circuit stated:

> Congress intended for *all conduct* now encompassed under the broadened definition of "telemarketing" to be subject to FTC regulations passed for the purpose of preventing fraud *and protecting the home.* The FTC enacted the TSR pursuant to these directions, and we find it was well within its statutory authority to do so.

420 F.3d at 338 (emphasis added). Thus, Congress has authorized the FTC to prevent for-profit telefunders acting on behalf of charitable organizations from engaging in abusive practices which invade the privacy of the home. Pursuant to this new charge, the FTC has determined that subjecting consumers to pre-recorded solicitation "pitches" by profit-making entities on

**1302**

behalf of charities is just such a practice. TBT's argument, that this interpretation exceeds the agency's statutory authority and is contrary to Congressional will, is unpersuasive. To the contrary, it appears the FTC is doing just what Congress directed it to do.

Additionally, the fact that the FCC has a more liberal regulation does not mean the FTC's rule is invalid. *See NFB II,* 420 F.3d at 348 n. 6 (finding unsurprising that FTC and FCC have different rules regarding charitable solicitations). Further, that the two federal agencies have failed to completely reconcile all differences in their telemarketing regulatory schemes, even after having been directed by Congress to maximize consistency, does not invalidate the regulations of either agency. In any event, it is not this Court's role to instruct the legislative branch on the task of assigning responsibilities among its agencies. Congress knows how to do this. If that arm of government finds the inconsistencies about which TBT complains intolerable, it can remedy the situation in the customary manner. In the meantime, however, "effectively instructing Congress to reorder an agency's jurisdiction would be an unwarranted exercise of judicial authority." *NFB II,* 420 F.3d at 348.

## V. CONCLUSION

Based on the foregoing, the Court determines that TBT's Complaint fails to state a claim upon which relief may be granted. Accordingly, it is ORDERED as follows:

1. Defendant Federal Trade Commission's Dispositive Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. 38), filed February 28, 2006, is GRANTED.

2. This action is DISMISSED.

3. The Clerk shall close this case.